UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CITIMORTGAGE, INC., | : | Case No. 1:11-cv-714 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| TODD CHRISTOPER CRAWFORD, | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS (Doc. 16)

This civil action is before the Court on Plaintiff's motion to dismiss Defendants' counterclaims (Doc. 16) and the parties' responsive memoranda.   (Docs. 28, 29).   The proposed counterclaim, which seeks to proceed as a class action, arises from events surrounding Plaintiff's filing for foreclosure due to Defendants' default on their mortgage loan.   Defendants have asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and violation of Ohio's Deceptive Trade Practices Act ("DTPA").   (Doc. 9-2 at 21-25).

## I.     FACTS <u>AS ALLEGED</u> BY THE COUNTERCLAIMANTS

For purposes of this motion to dismiss, the Court must: (1) view the counterclaims in the light most favorable to Defendants; and (2) take all well-pleaded factual allegations as true.   *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

In 2009, in response to the looming financial crisis, the federal government established the Home Affordable Modification Program ("HAMP") to prevent certain foreclosures.  (Doc. 28 at 5).   This program is designed to facilitate the modification of home mortgage loans to make mortgages affordable for borrowers who have defaulted or acknowledge an imminent risk of default.  (*Id.*)   HAMP is funded by the federal government, primarily with Troubled Asset Relief Program ("TARP") funds.  (*Id.* at 6). Through HAMP, the government incentivizes participating servicers to enter into agreements with homeowners at risk of default to adjust existing mortgage obligations to make monthly payments more affordable.  (*Id.*)   Servicers receive $1,000 for each HAMP modification.  (*Id.*)   Here, Plaintiff voluntarily participated in the program as part of its acceptance of TARP funds.  (*Id.*)

A HAMP modification occurs in two stages: first, a participating servicer gathers information and, if appropriate, offers the homeowner the document on which these counterclaims are based, called the Trial Period Plan ("TPP") Agreement.  (*Id.*)   The TPP Agreement is designed with HAMP as the source of its governing principles.  (*Id.* at 5). The TPP Agreement describes the duties and obligations of the homeowner and promises a permanent HAMP modification to those homeowners who execute the agreement and fulfill all the requirements of the program.  (*Id.* at 7).   The TPP consists of a three-month period during which the homeowner makes reduced mortgage payments based on a formula using the initial financial information gathered by the servicer.  (*Id.* at 6).   If the homeowner executes the TPP Agreement, makes three TPP monthly payments, and is able

to meet all the requirements of the program, the second stage of the HAMP process is triggered and the homeowner is offered a permanent modification. (*Id.*)

Originally, on or about August 8, 2003, Defendants obtained a loan from Plaintiff. (*Id.*) Defendants regularly and timely made their scheduled payments under the loan for several years. (*Id.*) However, in early 2009, Defendants lost a significant portion of their income and contacted Plaintiff as they were concerned about their ability to continue to make mortgage payments over the long term. (*Id.* at 8) Plaintiff instructed Defendants to stop making payments as they needed to be at least 60 days delinquent to be eligible for a HAMP modification. (*Id.*) Defendants did so, and once the loan was 60 days delinquent, filled out a hardship packet as requested by Plaintiff. (*Id.*) In June of 2009, Defendants were informed via telephone that they had been accepted into the TPP program and that if they made three on time payments in the modified amount, their modification would become permanent. (*Id.*) Defendants executed the TPP Agreement and returned it to Plaintiff. (*Id.*)

The cover letter enclosing Defendants' TPP states that homeowners "may qualify" for HAMP, cautions that they "may not qualify for this loan modification program," invites homeowners to "see if [they] qualify," mentions the possibility that homeowners "don't qualify," discusses events that will take place "if [Plaintiff is] able to modify" their loan, and makes clear to Defendants that Plaintiff would modify their loan only "[i]f [they] qualify under [HAMP] and comply with the terms of the [TPP]." (Doc. 9-2 at 33-36). Likewise, the TPP Agreement itself provides that it is "not a modification of the Loan

Documents," that "all terms and provisions of the Loan Documents remain in full force and effect," that the TPP Agreement should not "be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents," and that the TPP Agreement would not "take effect unless and until both [Defendants and Plaintiff] sign it and [Plaintiff] provides [Defendants] with a copy of this Plan with [Plaintiff's] signature." (*Id*. at 30-32). The TPP Agreement also states:

> If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

(*Id.* at 30).

In July of 2009, Defendants were forced to file for bankruptcy but continued to make TPP payments on their mortgage. (Doc. 28 at 8). Shortly thereafter, Plaintiff moved to have the stay lifted on the bankruptcy to allow Plaintiff to initiate foreclosure proceedings. (*Id.* at 9). After the stay was lifted and Defendants had contacted Plaintiff to discuss payment options, Plaintiff encouraged Defendants to reapply for a modification. Defendants again sent their financial information, began making the required TPP payments, and signed and returned the TPP Agreement. (*Id.*) Despite Defendants' compliance with the TPP program, Plaintiff continued with the foreclosure against Defendants. (*Id.*) In response, Defendants contacted Plaintiff and were told to disregard the foreclosure notice as the modification was still being processed and the foreclosure would be dismissed when the modification was finalized. (*Id.*)

Between November of 2009 and October of 2010, Defendants received a number of confusing and contradictory letters from Plaintiff regarding the status of their foreclosure and their modification application, and Defendants were required to resubmit documents that they had already submitted numerous times. (*Id.* at 9-10). Despite this confusion, Defendants complied with all requests and continued to make TPP payments as instructed. (*Id.* at 10). Defendants were repeatedly told via telephone that their application was being processed and they would receive their paperwork shortly. (*Id.* at 11).

In November of 2010, Defendants contacted Plaintiff to make their TPP payment, but the payment was refused with the explanation that Plaintiff could no longer accept payments as the loan was in foreclosure. (*Id.*) Defendants contacted counsel for Plaintiff, who was unaware that Defendants had entered into a TPP Agreement. (*Id.*) Once counsel was notified of the TPP Agreement, Plaintiff voluntarily moved to dismiss the foreclosure. (*Id.*) Defendants once against contacted Plaintiff to make their TPP payment, and were once again told to send their financial information so the loan modification could be processed. (*Id.*) Despite the pendency of this request, Plaintiff filed a second foreclosure action on January 24, 2011, and Defendants have not been offered a loan modification under HAMP. (*Id.*)

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a)

requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).   Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Id*. (citing *Twombly*, 550 U.S. at 555).   In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986).   Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id*.

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949.   A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.   Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. (citing Fed. Rule Civ. Proc. 8(a)(2)).

## III.  ANALYSIS

### A.    Breach of Contract (Count I)

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a binding contract; (2) that the non-breaching party performed its contractual obligations; (3) that the other party failed to fulfill its contractual obligations without legal excuse; and (4) that the non-breaching party suffered damages as a result of the breach.  *Nachar v. PNC Bank, N.A.*, 2012 U.S. Dist. LEXIS 144475, at *9-10 (N.D. Ohio Oct. 5, 2012) (citing *Baghani v. Charter One Bank F.S.B.*, 2009 Ohio 490, 2009 WL 280399, at ¶ 13 (2009)). Defendants allege that Plaintiff breached the TPP Agreement "[b]y beginning the foreclosure process."  (Doc. 9-2 at ¶ 78).

Defendants' breach of contract claim fails for several reasons, however.

First, both the cover letter that encloses the TPP Agreement, and the TPP Agreement itself, make crystal clear that the TPP Agreement would only take effect when both the Defendants and Plaintiff signed the document and Plaintiff had returned it to Defendants.  (Doc. 9-2 at 30-36).   And, under the law, "in Ohio when the parties' express intent is not to be bound until the formal contract has been signed, no contract is formed until the agreement is executed."  *Allen v. Ford Motor Co.*, 1999 WL 644345, at *2 (6th Cir. Aug. 18, 1999); *see Gen. Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669, 676 (6th Cir. 1952) (no contract was formed because defendant did not sign document that required execution).   Defendants do not allege that Plaintiff signed their TPP Agreement.   Thus,

because "the TPP … does not create a binding contract when only one party has signed it," Defendants' TPP Agreement never became effective.  *Rummell v. Vantium Capital, Inc.*, 2012 WL 2564846, at *6 (E.D. Mich. July 2, 2012); *see, e.g., Heikkinen v. Bank of Am.*, 2012 WL 628608, at *6 (E.D. Mich. Feb. 27, 2012) ("the TPP … did not ripen into a binding agreement, primarily because [it] bears only [plaintiff's] signature").

Moreover, Plaintiff's acceptance of TPP payments does not create a valid contract as all TPPs contemplate reduced payments and such a finding would render every TPP Agreement binding when sent, in contravention of the expressly stated intent that the TPP Agreement would not "take effect unless and until both [Defendants and Plaintiff] sign it and [Plaintiff] provides [Defendants] with a copy of this Plan with [Plaintiff's] signature." (*Id.* at 30-32).  *See, e.g., Lonberg v. Freddie Mac*, 776 F. Supp. 2d 1202, 1210 (D. Or. 2011) (servicer did not "waiv[e] its right[s]" by "accept[ing] plaintiff's [TPP] payments" because "the loan modification application process explicitly required plaintiff to … deliver payments to defendant").   Additionally, the TPP Agreement itself states that Plaintiff's acceptance of TPP payments "will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities."  (Doc. 9-2 at 31).  Furthermore, the Defendants' loan documents, which the TPP Agreement cautions "remain in full force and effect" during the trial period, allow Plaintiff to "accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder."  (Doc. 9-2 at 32; Doc. 16-1 at 37.)

Under the law, "[t]ypically, Ohio courts enforce antiwaiver clauses according to their terms." *Ford Motor Credit Co. v. Ryan*, 189 Ohio App. 3d 560, 603 (2010); *accord Skurka Aerospace v. Eaton Aerospace*, 2011 WL 1135946, at *6 (N.D. Ohio Mar. 29, 2011) (collecting cases). Here, the explicit terms of Defendants' mortgage and the TPP Agreement make clear that acceptance of TPP payments does not constitute a waiver of any of Plaintiff's rights.

Second, Ohio's statute of frauds provides that "[n]o party to a loan agreement may bring an action on a loan agreement unless the agreement is in writing and is signed by the party against whom the action is brought." O.R.C. § 1335.02(B). As Defendants do not allege that Plaintiff signed the TPP Agreement, the statute of frauds bars Defendants' claim. *See Sharpe v. PHH Mortg. Corp.*, 2012 WL 1809468, at *6 (S.D. Ohio May 17, 2012) (Ohio's statute of Frauds (Section 1335.02(B)) required dismissal of claim that servicer breached oral trial loan modification agreement).

Third, Defendants have not adequately alleged consideration, as neither the TPP payments nor Defendants' submission of documents are sufficient. A promise "to pay a sum less than that which [a party] was already obligated to pay" is not consideration. *Rhoades v. Rhoades*, 40 Ohio App. 2d 559, 562 (1974). Consequently, the submission of TPP payments does not qualify as consideration, as Defendants already owed Plaintiff significantly more under the terms of their mortgage. *See, e.g., Vida v. OneWest Bank*, 2010 WL 5148473, at *7 (D. Or. Dec. 13, 2010); *Brockbank v. JPMorgan Chase Bank*,

2012 WL 1142933, at *4 (D. Utah Apr. 4, 2012); *Salgado v. America's Servicing Co.*, 2011 WL 3903072, at *2 (D. Ariz. Sept. 6, 2011); *Rackley v. JPMorgan Chase Bank*, 2011 WL 2971357, at *4 (W.D. Tex. July 21, 2011).   Similarly, the "submission of . . . documentation" is not consideration.   *See, e.g., Mehta v. Wells Fargo*, 737 F. Supp. 2d 1185, 1196-98 (S.D. Cal. 2010); *Rackley v. JPMorgan Chase*, 2011 WL 2971357, at *4 (W.D. Tex. July 21, 2011) (citing cases).   If document submission were sufficient, "each would-be barista not hired after filling out an application at Starbucks and handing it to a Starbucks employee" could claim consideration.   *Banaga v. Taylor Bean Mortg.*, 2011 WL 5056985, at *4 (N.D. Cal. Oct. 24, 2011).

Finally, even if the TPP Agreement were a valid contract, it prohibits only a "foreclosure sale" while the TPP Agreement is effective, which never took place here. (Doc. 9-2 at 31).

Consequently, the breach of contract claim is appropriately dismissed.

## B. Implied Covenant of Good Faith and Fair Dealing (Count II)

Defendants allege that Plaintiff breached an implied covenant of good faith and fair dealing in the TPP Agreement.   (Doc. 9-2 at ¶ 85).   An implied covenant, however, "does not stand alone" as "a separate claim."   *Pappas v. Ippolito*, 177 Ohio App. 3d 625, 642 (2008).   Furthermore, a duty of good faith and fair dealing "cannot exist until the underlying contract is formed."   *Walker v. Dominion Homes, Inc.*, 164 Ohio App. 3d 385, 397 (2005).   As the unsigned TPP Agreement is not an enforceable contract, the breach of

implied covenant of good faith and fair dealing claim is appropriately dismissed.

**C.      Promissory Estoppel (Count III)**

The elements of a claim of promissory estoppel are: "(1) a clear and unambiguous promise; (2) reliance on that promise; (3) reliance that was reasonable and foreseeable; and (4) damages caused by that reliance."  *JP Morgan Chase Bank, N.A. v. Horvath*, 872 F. Supp. 2d 744, 749 (S.D. Ohio 2012) (citing *Current Source, Inc. v. Elyria City Sch. Dist.*, 157 Ohio App. 3d 765, 773 (Ohio Ct. App. 2004) (citing *Healey v. Republic Powdered Metals, Inc.*, 85 Ohio App. 3d 281, 284 (Ohio Ct. App. 1992))).  Defendants allege that Plaintiff breached a promise in the TPP Agreement to permanently modify their loan if they made three reduced payments and submitted some documents.  (Doc. 9-2 at ¶ 91). However, this claim fails for several reasons.

First, the TPP Agreement does not make a "clear and unambiguous promise" that Plaintiff would permanently modify Defendants' loan.  *Kena Props., LLC v. Merchants Bank & Trust*, 218 F. App'x 402, 406 (6th Cir. 2007); *see also Nachar v. PNC Bank,* 2012 WL 4758124, at *6 (N.D. Ohio Oct. 5, 2012).  The TPP Agreement explicitly contemplated that Defendants could temporarily make reduced payments while they applied for a permanent loan modification by submitting documents that Plaintiff needed to determine if Defendants qualified under HAMP, and, moreover, that Plaintiff had discretion to decide whether to modify the loan.  Defendants have not alleged that Plaintiff found them qualified under HAMP, nor that they received a TPP Agreement

-11-

signed by Plaintiff, nor a permanent Modification Agreement. Plaintiff's statement in the TPP Agreement that it would "provide [Defendants] with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage" if Defendants were "in compliance with [the] Loan Trial Period and [Defendants'] representations in Section 1 continue to be true in all material respects" must be read in the context of the rest of the TPP Agreement, which repeatedly, clearly, and unequivocally states that Defendants might or might not qualify for HAMP modification and that the TPP Agreement would only take effect once both parties had signed it. Thus, Defendants' "compliance with the terms of the TPP" explicitly did not guarantee a permanent modification. *Geske v. Wells Fargo Bank*, 2012 WL 1231835, at *6 (N.D. Tex. Apr. 12, 2012). That is, "even accepting as true [Defendants'] allegations that they complied with the terms of the TPP by providing requested documentation and making certain payments," the TPP "gives [the servicer] broad discretion to determine whether the [Defendants] qualified for a permanent loan modification." *Id.*[1]

Similarly, the counterclaims do not adequately allege "reasonable … reliance" on any promise. *Militiev v. McGee*, 2010 WL 5550258, at *6 (Ohio Ct. App. Dec. 30, 2010).

---

[1] *See also Stolba v. Wells Fargo*, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011) ("the plain language of the relevant TPP documents makes clear that satisfying the TPP conditions for permanent modification does not guarantee that Plaintiff would receive such modification"); *Bourdelais v. J.P. Morgan Chase Bank*, 2011 WL 1306311, at *4 (E.D. Va. Apr. 1, 2011) (TPP's "plain language" "belies" plaintiffs' claim that "homeowners who execute the TPP … and fulfill its documentation and payment requirements are entitled to permanent modifications"); *Grill v. BAC Home Loans Servicing*, 2011 WL 127891, at *8 (E.D. Cal. Jan. 14, 2011) (dismissing TPP-based promissory estoppel claim because TPP "expressly placed plaintiff on notice that issuance of a loan modification was not guaranteed by simply sending in the requested documentation and making [TPP] payments").

"[C]ourts have concluded that a party's reliance on a TPP is not reasonable" because "much of the relevant TPP language is conditional."   *Stolba*, 2011 WL 3444078, at *5.[2] Consequently, any reliance on the part of Defendants on any promise to modify Defendants' loan obligations on the part of Plaintiff would have been unreasonable given the plain language of the TPP Agreement.

As a result, the promissory estoppel claim is appropriately dismissed.

## D.  Violation of Ohio's Deceptive Trade Practices Act (Count IV)

Finally, Defendants assert that Plaintiff violated the DPTA by offering to permanently modify putative class members' loans if they made three reduced payments and submitted the necessary documentation.   (Doc. 9-2 at ¶ 99).   However, "a consumer does not have standing to due under the DPTA."   *Blankenship v. CFMOTO Powersports Canton*, 161 Ohio Misc. 2d 5, 17 (2011); *Robins v. Global Fitness Holdings*, 838 F. Supp. 2d 631, 649-50 (N.D. Ohio 2012) (citing cases).   Defendants concede they lack the necessary standing to sue under the DPTA and "the complaint may not be amended by the briefs in opposition to a motion to dismiss."   *In re Porsche Cars N. Am.*, 880 F. Supp. 2d 801, 842 (S.D. Ohio 2012); *see Guzman v. US. Dep't of Homeland Sec.*, 679 F.3d 425,429 (6th Cir. 2012).

---

[2] *See also Brady v. Chase Home Fin.*, 2012 WL 1900606, at *9 (W.D. Mich. May 24, 2012) ("any reliance … would have been unreasonable, because the TPP expressly stated that [servicer] had to send [borrower] a signed copy of the TPP, which [borrower] concedes never occurred"); *Pratt v. BAC Home Loan Servicing*, 2012 WL 1565232, at *5 (D. Md. Apr. 30, 2012) ("As Plaintiff does not allege to have ever received a fully executed copy of the Modification Agreement … it would have been unreasonable for Plaintiff to continue making reduced payments in reliance on the TPP").

Consequently, the DTPA claim is also appropriately dismissed.

## IV.   CONCLUSION

Accordingly, based on the foregoing, Plaintiff's Motion to Dismiss (Doc. 16) is **GRANTED** and Defendants' counterclaims are hereby **DISMISSED**.

**IT IS SO ORDERED.**

Date:   3/26/13                                     *s/ Timothy S. Black*

Timothy S. Black
United States District Judge